435 So.2d 1092 (1983)
QUINTANA PETROLEUM CORPORATION
v.
ALPHA INVESTMENTS CORPORATION, et al.
No. 82 CA 0936.
Court of Appeal of Louisiana, First Circuit.
June 28, 1983.
Rehearing Denied August 23, 1983.
*1093 James R. McClelland, Aycock, Horne, Caldwell, Coleman & Duncan, Franklin, for plaintiff.
Bernard E. Boudreaux, Jr., Bauer, Darnall, McNulty & Boudreaux, Franklin, for Norma Lee Luke Terrell.
Terry G. Breaux, Conery & Breaux, Franklin, for P.F. Industries, Inc., Seaman-Crouse, Ltd., Joseph A. Seaman and Edwin L. Crouse.
Robert P. Fuhrer, Morgan City, for Alpha Investments Corp.
Before COVINGTON, LANIER and ALFORD, JJ.
LANIER, Judge.
This is a concursus proceeding (La.C.C.P. arts. 4651-4662) brought by Quintana Petroleum Corporation (Quintana) to determine the ownership of a 25% mineral interest in certain lands located in St. Mary *1094 Parish, Louisiana. Impleaded in this suit for having conflicting claims are Alpha Investments Corporation (Alpha), P.F. Industries, Inc. (PFI), Seaman-Crouse, Ltd., a partnership composed of Joseph A. Seaman and Edwin F. Crouse, and Norma Lee Luke Terrell. In its answer, Alpha alleged that PFI, Seaman-Crouse, Ltd., Joseph A. Seaman, Edward L. Crouse and/or Norma Lee Luke obtained this mineral interest from Alpha by fraud. PFI, Joseph A. Seaman and Norma Lee Luke Terrell filed a motion to strike the allegations of fraud and pled the two year prescription of La.C.C. art. 3543 to bar an attack by Alpha on a sheriff's sale in their chain of title. The trial court denied the motion to strike the allegations of fraud and sustained the exception of prescription. Alpha commenced an appeal to this court from the judgment sustaining the exception of prescription, but subsequently abandoned this appeal, and that judgment is now final. PFI, Joseph A. Seaman and Norma Lee Luke Terrell filed a motion for summary judgment contending that they were the owners of the 25% mineral interest in the proportions of 45%, 45% and 10% respectively. The trial court granted the summary judgment as prayed for. This suspensive appeal followed.

FACTS
On or about November 3, 1964, Everett M. Luke granted an oil, gas and mineral lease to Humble Oil and Refining Company on 25% of the minerals (Luke mineral interest) in or under approximately 472.9 acres of land located in St. Mary Parish, Louisiana. In 1966, Quintana completed a well (Maryland No. 2-A) on land immediately adjacent to this property and a portion of the property was included in a conservation unit created around this well.
On September 14, 1972, Reisfeld & Son, Inc. (Reisfeld) filed a suit against Lone Star Packing Company, Inc. (Lone Star), Everett M. Luke and Paul Sidney Luke in the Sixteenth Judicial District Court, Parish of St. Mary. This suit contended that Lone Star had an outstanding balance on an open account with Reisfeld and that Everett M. Luke personally guaranteed payment of the account. Coupled with the open account claim was a revocatory action (La.C.C. arts. 1968 et seq.) contending Everett M. Luke transferred certain properties located in St. Mary Parish to Paul Sidney Luke and the purpose of these transfers was to preclude Reisfeld from executing against them for payment of the account. The properties initially listed did not include the Luke mineral interest. Reisfeld requested that the transfers by Everett M. Luke to Paul Sidney Luke be set aside as fraudulent. On October 11, 1972, Lone Star, Everett M. Luke and Paul Sidney Luke answered this suit, and on October 30, 1972, the trial judge fixed the case for trial on January 30, 1973. On October 19, 1972, Norma Lee Luke and Everett M. Luke were judicially separated.
On December 28, 1972, a document entitled "CONTRACT OF SALE OF MINERAL INTERESTS" was recorded in the conveyance records of St. Mary Parish. This contract purportedly transferred all of the Luke mineral interest to Alpha.[1]
On January 22, 1973, Reisfeld filed a supplemental petition for a writ of attachment to seize the Luke mineral interest. This pleading contends that "... Everett M. Luke has entered into a contract to sell to Alpha Investments Corporation of Pharr, Texas, certain mineral rights, interest and leases ...", and that the purpose of Luke was to dispose of the property to give an unfair preference to one of his creditors and to put the property beyond the reach of other creditors. Attached to the supplemental petition was a copy of the Luke-Alpha agreement recorded on December 28, 1972. This supplemental petition did not make either Norma Lee Luke or Alpha a party to the proceedings and did not seek a revocation of the Luke-Alpha agreement. The trial court granted the attachment and the Luke mineral interest was seized by the sheriff on January 23, 1973. On January *1095 29, 1973, Paul Sidney Luke was dismissed as a party defendant from the suit. On February 1, 1973, Lone Star and Everett M. Luke answered the supplemental petition. On February 2, 1973, Reisfeld filed a supplemental petition alleging that Reisfeld was entitled to seize by way of garnishment any proceeds of the contract of sale between the Lukes and Alpha which might be in Alpha's possession. Reisfeld further alleged that it feared that Alpha would pay over to the Lukes the consideration recited in the contract of sale and such property was subject to seizure as an adjunct to the writ of attachment already granted.
On February 7, 1973, the trial court rendered judgment in favor of Reisfeld and against Lone Star and Everett M. Luke for the balance due on the open account of $57,846.93. The trial court also rendered judgment maintaining the writ of attachment and recognized Reisfeld's "liens and privilege" on all property attached. This judgment is not against Alpha or Norma Lee Luke and did not rescind the Luke-Alpha transaction.
On October 21, 1973, Alpha executed a contract of sale to PFI for all its rights, interest and leases in the Luke mineral interest and executed a quitclaim deed in favor of PFI for the Luke mineral interest. On November 1, 1973, Alpha assigned all of its rights, title and interest in the Luke mineral interest to PFI. All three of these agreements were recorded in the conveyance records of St. Mary Parish on November 14, 1973.
On December 3, 1973, the Sheriff of St. Mary Parish seized the Luke mineral interest pursuant to a writ of fieri facias issued under the judgment in the Reisfeld suit[2] and scheduled a public auction to sell the property on January 23, 1974. On January 7, 1974, Reisfeld had an attorney-at-law appointed to represent Alpha and PFI in its suit (apparently for service of notice of seizure). On January 22, 1974, Reisfeld and PFI entered into a compromise agreement concerning the Luke mineral interest. In this agreement, Reisfeld and PFI recognized the conveyance by the Lukes to Alpha and the conveyances by Alpha to PFI. In order to avoid potential litigation, Reisfeld and PFI agreed that Reisfeld would attempt to buy in the Luke mineral interest at the sheriff's sale and, upon acquisition by Reisfeld at the sale, PFI would deliver to Reisfeld all of the rights, title and interest in the Luke mineral interest that it acquired from Alpha. Reisfeld agreed that when it recovered $60,780 from mineral lease bonuses, delay rentals or royalties, it would convey back to PFI all of its rights, title and interest in the Luke mineral interest. On January 22, 1974, PFI assigned all of its rights, title and interest in the Luke mineral interest to Reisfeld.
On January 23, 1974, PFI and Norma Lee Luke entered into a compromise agreement. Norma Lee Luke agreed not to cause a delay in the judicial sale of the Luke mineral interest and agreed not to assert any claim against the mineral rights to be received by PFI pursuant to the Reisfeld-PFI compromise agreement. PFI asserted that it was the owner of two promissory notes secured by mortgages on property not pertinent to these proceedings and agreed to proceed to assert its right to foreclose on the mortgages and, after such foreclosure, to transfer to Norma Lee Luke the entirety of the rights, title and interest which PFI would acquire at the judicial sale of such property. PFI further agreed that if it was unable to deliver title to such property to Norma Lee Luke, that, in the alternative, it would assign to her 10% of the Luke mineral interest it would receive from Reisfeld under the Reisfeld-PFI compromise agreement.
The judicial sale of the Luke mineral interest was held on January 23, 1974, and it was purchased by Reisfeld for $20,000. On January 23, 1974, Norma Lee Luke granted a quitclaim deed to Reisfeld of all her rights, title and interest in the Luke mineral interest. On May 16, 1974, PFI assigned 25% of the Luke mineral interest *1096 to Seaman-Crouse, Ltd., a partnership composed of Joseph A. Seaman and Edwin F. Crouse. A copy of the Reisfeld-PFI compromise agreement was attached to this assignment and made a part thereof.
On February 27, 1978, Reisfeld reconveyed the 25% Luke mineral interest to PFI in accordance with the Reisfeld-PFI compromise agreement.[3]
On August 16, 1978, Norma Lee Luke Terrell[4] filed suit to obtain specific performance of her compromise agreement with PFI by requiring PFI to convey to her a 10% ownership of the Luke mineral interest and for an accounting of mineral royalties. This suit resulted in a default judgment in her favor recognizing her 10% interest in the Luke mineral interest and ordering PFI to pay her $1,375 in royalties. No appeal was taken from this judgment and it is now final.
Apparently, prior to December 22, 1979, the Maryland No. 2-A well was plugged and abandoned. On December 22, 1979, Quintana completed the Luke No. 1 well on the property burdened by the Luke mineral interest. Production from this well began on January 13, 1980. On February 2, 1980, Quintana completed the Shinn No. 9 well in a unit which included a portion of the land subject to the Luke mineral interest. Production from this well began on February 18, 1980. Quintana filed this concursus proceeding on June 18, 1980.
On July 2, 1980, PFI assigned 20% of the Luke mineral interest to Joseph A. Seaman. Effective December 1, 1980, Seaman-Crouse, Ltd. assigned all of its rights, title and interest in the Luke mineral interest (25% of 25%) to John A. Seaman.

SUMMARY JUDGMENT
In Morgan v. Matlack, Inc., 342 So.2d 167, 169 (La.1977), appears the following:
The law is well settled that a motion for summary judgment should be granted if, and only if, the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966; Stallings v. W.H. Kennedy & Son, Inc., 332 So.2d 787 (La. 1976). Only when reasonable minds must inevitably conclude that the mover is entitled to judgment as a matter of law on the facts before the court is a summary judgment warranted. Cates v. Beauregard Electric Cooperative, Inc., 328 So.2d 367 (La.1976). The burden of showing that there is not a genuine issue of material fact in dispute is upon the mover for summary judgment. Any doubt is resolved against the granting of a summary judgment and in favor of a trial on the merits to resolve disputed facts. Kay v. Carter, 243 La. 1095, 150 So.2d 27 (1963).
If the supporting documents presented by a party moving for a summary judgment are sufficient to resolve all genuine issues of fact, the burden shifts to the opposing party to present evidence showing that material facts are still at issue. At this point, the opposing party may no longer rest on the allegations and denials contained in his pleadings. La.C.C.P. art. 967; Sanders v. Hercules Sheet Metal, Inc., 385 So.2d 772 (La.1980); Broussard v. Henry, 423 So.2d 67 (La.App. 1st Cir.1982).

LEGAL EFFECT OF LUKE-ALPHA TRANSACTION
The Luke-Alpha contract recorded on December 28, 1972, is entitled "CONTRACT OF SALE OF MINERAL INTERESTS". This contract commences by providing that "[T]he Sellers agree to sell and the Purchaser agrees to buy the mineral interest, rights and leases appertaining thereto, ...". In Paragraph I of the agreement, the parties stated that "[T]he mineral rights, interests and leases to be purchased under this contract...". (Emphasis added). In Paragraph III of the contract, the Lukes agreed, *1097 upon request, to furnish Alpha with an abstract of title for the mineral interest and Alpha agreed to submit any objections to the title in writing within 90 days. The Lukes were thereafter given a reasonable time to meet objections. The last sentence of Paragraph III then provides as follows:
After Purchaser's examination of all abstracts or chains of title appertaining to the aforementioned interest, all such instruments and abstracts shall be returned to the Seller and retained by the Seller until such time as this transaction has been fully consumated (sic). (Emphasis added).
The courts are bound to give legal effect to all written contracts according to the true intent of the parties and this intent is to be determined by the words of the contract when these are clear, explicit and lead to no absurd consequences. La.C.C. art. 1945; Leenerts Farms, Inc. v. Rogers, 421 So.2d 216 (La.1982); Campesi v. Margaret Plantation, 417 So.2d 1265 (La.App. 1st Cir.1982), writ denied 422 So.2d 163 (La. 1982). The meaning and intent of the parties to the written contract in such cases must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence. La.C.C. art. 2276; Tauzin v. Claitor, 417 So.2d 1304 (La. App. 1st Cir.1982), writ denied, 422 So.2d 423 (La.1982). However, when the terms of a written contract are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, or fraud is alleged, parol evidence is admissible to clarify the ambiguity and to show the intention of the parties. Dixie Campers, Inc. v. Vesely Company, 398 So.2d 1087 (La.1981); Carter's Insurance Agency, Inc. v. Franklin, 428 So.2d 808 (La.App. 1st Cir. 1983).
When Reisfeld filed the supplemental petition to attach the Luke mineral interest, it referred to the Luke-Alpha contract as "a contract to sell". Joseph E. Friend, Reisfeld's attorney, testified in deposition (without objection) that he considered the Luke-Alpha transaction an agreement to sell and not a sale, and this is why he had the Luke mineral interest attached. When Reisfeld filed the supplemental petition to garnish Alpha, it sought to seize the proceeds of the contract which might be in Alpha's possession. In the Reisfeld-PFI compromise agreement, the parties referred to the mineral interest "conveyed" by the Lukes to Alpha and the interest "conveyed" by Alpha to PFI. Paragraph E of the Reisfeld-PFI compromise agreement provides as follows:
PFI contends that as a result of the conveyances described in paragraphs C and D above, PFI acquired all the right, title and interest of Everett M. Luke and his wife in and to the property described in paragraphs B and C above prior to the date Reisfeld obtained the judgment against Everett M. Luke. Reisfeld contends that the consideration paid by Alpha Investments Corporation to Everett M. Luke and Norma Lee Junca Luke was inadequate, and that in any event, the conveyances should be limited to the property which is expressly described in the conveyance from Everett M. Luke and Norma Lee Junca Luke to Alpha Investments Corporation. In his deposition, Everett M. Luke testified that the Luke-Alpha contract was one of sale. John W. Carlisle testified in his deposition that he was an officer of Alpha and was the attorney who drafted the Luke-Alpha contract. He further testified that this agreement was intended to be a sale and not an agreement to sell. Alpha, by executing purported conveyances in favor of PFI, apparently construed the Luke-Alpha contract as a sale. La.C.C. art. 1956.
The trial court did not specifically rule on the legal effect of the Luke-Alpha contract. The trial court ruled that Alpha could not collaterally attack the Reisfeld-PFI compromise agreement, conveyance and reconveyance, and that Reisfeld's title acquired at the sheriff's sale became good against the world when the judgment sustaining the two year prescription of La.C.C. art. 3543 became final. The trial court found that *1098 "... the attack that Alpha wishes to make at this time simply comes too late and in the wrong proceeding."
We believe that a resolution of the legal effect of the Luke-Alpha contract is essential to a disposition of this case. The Luke-Alpha contract was recorded in the public records of St. Mary Parish on December 28, 1972, and became effective against third persons. At that time, the Luke mineral interest had not been attached, and Reisfeld did not have a judicial mortgage (judgment) against Everett M. Luke. If the Luke-Alpha contract is an agreement to sell (and not a sale), title to the mineral interest remained in Everett Luke (and also in Norma Lee Luke if the interest is community property). When Reisfeld attached the Luke mineral interest on January 23, 1973, it acquired a privilege effective that date when the open account claim was reduced to judgment and the privilege recognized on February 7, 1973. La.C.C.P. art. 3511; Citizens Savings and Loan Association v. Pegues, 294 So.2d 278 (La.App. 1st Cir.1974), application denied 296 So.2d 837 (La.1974). The subsequent writ of fieri facias issued pursuant to the Reisfeld judgment and the judicial sale thereafter on January 23, 1974, were valid. Since more than five years have elapsed since this judicial sale, any claims of nullity are now prescribed, if Everett Luke and Norma Lee Luke did not convey title to Alpha in the December 1972 contract. La.R.S. 9:5642; La.C.C. art. 3543. In such a situation, the judgment of the trial court would be correct.
However, if the Luke-Alpha contract is a sale, a different result occurs. When the Luke-Alpha contract was recorded in the public records on December 28, 1972, third persons were put on notice that title to the mineral interest conveyed therein passed to Alpha. Reisfeld had no judicial mortgage or privilege at this time.[5] Reisfeld did not file a revocatory action against Alpha and the judgment that Reisfeld obtained on February 7, 1973, did not rescind the Luke-Alpha contract.[6] The conveyances by Alpha to PFI were recorded in the public records of St. Mary Parish on November 14, 1973. The writ of fieri facias by which the Luke mineral interest was sold was issued in the Reisfeld suit on November 29, 1973, and the property was seized pursuant to the writ on December 3, 1973. At that time, record title to the Luke mineral interest was in PFI.
If the Luke-Alpha contract was a sale, then when the Luke mineral interest was attached, when the Reisfeld judgment was rendered, when the writ of fieri facias was issued and executed and when the sheriff's sale occurred, the Luke mineral interest was not owned by the judgment debtor, Everett M. Luke. The proceedings from the attachment until the sale of this mineral interest were not binding on Alpha because Alpha was not made a party defendant to the suit[7] and because the Luke-Alpha agreement had not been rescinded.
The sale of a thing belonging to another is null. La.C.C. art. 2452. This rule applies to judicial sales as well as conventional sales. Taylor v. General Gas Corporation, 87 So.2d 220 (La.App. 2nd Cir. 1956). The action of the trial court which sustained the plea of two year prescription of La.C.C. art. 3543 did not preclude an attack on the sheriff's sale as being an absolute nullity. In Bordelon v. Bordelon, 180 So.2d 855, 857 (La.App. 3rd Cir.1965), appears the following:
LSA-C.C. Art. 3543 provides that judicial sales may not be attacked for "informalities of legal procedures" after five years from the time of the sale by minors or interdicts, or after only two years by persons not under legal disability. The trial court sustained the defendants' exception *1099 of prescription based upon this code article.
The relatively short prescriptive period of this article is provided to create confidence in judicial sales by protecting good faith purchasers from litigation concerning technical irregularities connected with such sales; this prescription is intended to cure only relative nullities (informalities), however, not absolute nullities (matters of substance) which go to the essence of the sale and affect the substantive rights of the parties with interest in the property sold.... (Footnote omitted).
This distinction was also recognized in Peyrefitte v. Harvey, 312 So.2d 159 (La.App. 1st Cir.1975), writ refused 314 So.2d 736 (La.1975). The sale of the property of another is an absolute nullity. However, the five year prescription of La.R.S. 9:5642 is not applicable to a sheriff's sale of the property of another because the second paragraph of that statute provides as follows:

This prescription does not apply to any attempted sale of property, not belonging to the defendant in execution, nor does it apply to minors and interdicts.[[8]] (Emphasis added).
Alpha may attack the sheriff's sale as an absolute nullity, even though it is now precluded from attacking the sale as a relative nullity.
Determining the nature of the Luke-Alpha contract is a mixed question of law and fact. The documentary evidence of record shows that there is conflicting evidence on whether the contract is a sale or an agreement to sell. Parol evidence was introduced by way of the pleadings and by deposition on this factual issue. Because there are material factual conflicts existing on this issue, the granting of a summary judgment is precluded.

DIFFERENCES IN DESCRIPTION OF LUKE MINERAL INTEREST
The description of the Luke mineral interest attached by Reisfeld is essentially the same as that contained in the Luke-Alpha contract.[9] Essentially, this interest appears to be all of the rights, title and interest of Everett M. Luke included in the MA-13-SAND UNIT A located in various sections and townships in St. Mary Parish. However, the description of the Luke mineral interest attached to the writ of fieri facias is different from that in the attachment.[10] The description attached to the writ of fieri facias essentially describes all of the rights, title and interest of Everett M. Luke in and to the oil, gas and other minerals or mineral rights in a tract of land in St. Mary Parish described as the "highland of Garrett Plantation". The record in this case is not clear as to whether or not the two descriptions are mutually inclusive or if they are different, the degree and/or extent of the difference. If the Luke-Alpha contract was a sale, and if the minerals transferred therein were less than the total amount owned by Everett M. Luke, then Reisfeld could have validly seized the residue pursuant to its writ of fieri facias. This is an issue of fact which is not resolved by the documentary evidence of record and thus precludes a summary judgment.

FRAUD IN THE ALPHA-PFI TRANSFERS
If the Luke-Alpha transaction was a sale, and the sheriff's sale of no legal effect, the titles of Joseph A. Seaman, Norma Lee Luke Terrell and PFI are contingent upon the validity of the Alpha-PFI transactions.
In answer to the Quintana concursus petition, Alpha admitted executing the three conveyances in favor of PFI (the sale, quitclaim and assignment), but alleged these instruments were only to be used for obtaining investors in a joint venture operation between Alpha and PFI. Alpha further *1100 alleged that PFI agreed not to use the three instruments until the investors were obtained and until Alpha was paid $200,000 in cash and 60,000 shares of capital stock in PFI. Alpha also alleged that PFI's agent was allowed to have possession of these documents solely for the purpose of consulting with potential investors. Contrary to their agreement, PFI recorded the instruments in St. Mary Parish and did not and has not paid the cash consideration agreed upon. Thus, Alpha contends in its answer that the Alpha-PFI conveyances were fraudulently obtained and recorded, and thus did not transmit valid title.
In his deposition, Everett M. Luke testified that Pat Farr, PFI's president, represented three doctors who wanted to invest in the Luke mineral interest. Alpha agreed to sell PFI two promissory notes and the Luke mineral interest for $300,000, plus 60,000 shares of PFI stock valued at $1.00 per share. The doctors did not want to put up any money until PFI had title to the minerals. The documents were drawn up for Farr to show the investors. PFI then proceeded to record the instruments and did not pay the cash consideration of $300,000 agreed upon. Luke also testified that all three documents (the sale, assignment and quitclaim deed) were altered after they were signed. The description of the property in the quitclaim deed was changed. The sale made no reference to the $300,000 cash consideration and did not refer to a deduction in price for a judgment.
John W. Carlisle testified in his deposition that the Alpha-PFI transaction was to be for $200,000, 60,000 shares of PFI stock and payment of a bank note and a judgment in favor of James Anderson. Title was not intended to pass from Alpha to PFI until PFI raised the funds. Pat Farr, PFI's president, took Carlisle's file with the instruments on the pretense of conferring with investors. Farr apparently removed the instruments from the file and had them recorded in St. Mary Parish. The instruments were not to be recorded until the cash consideration was paid. The cash consideration was never paid. Carlisle also testified that the quitclaim deed appeared to be altered.
A claim of fraud raises an issue of fact. Sinclair Oil & Gas Company v. Delacroix Corporation, 235 So.2d 187 (La.App. 4th Cir.1970). Although the movers for the summary judgment introduced evidence by way of deposition to refute the claims of Everett M. Luke and John W. Carlisle, clearly material issues of fact exist concerning the validity of the Alpha-PFI conveyances. Such issues of fact preclude the granting of a summary judgment.

CONCLUSION
For the foregoing reasons, the summary judgment granted by the trial court is reversed and this cause is remanded to the trial court for further proceedings. The appellees are cast for all costs of this appeal.
REVERSED AND REMANDED.

APPENDIX 1

CONTRACT OF SALE OF MINERAL INTERESTS
This contract made and entered into on this ____ day of December, 1972 by and between EVERETT MARTIN LUKE, et ux, NORMA LEE JUNCA LUKE, residents of Pharr, Hidalgo, Texas, hereinafter referred to as the Sellers, and ALPHA INVESTMENTS CORP., a corporation organized under and pursuant to the laws of the State of Texas, Post Office Box 788, Pharr, Texas, 78577, hereinafter referred to as the Purchaser.

WITNESSETH:
The Sellers agree to sell and the Purchaser agrees to buy the mineral interest, rights and leases appertaining thereto, hereinafter described upon the following terms and conditions:

I.
The mineral rights, interests and leases to be purchased under this contract is located in St. Mary Parish, Louisiana and consists *1101 of approximately 620 acres of land, more or less, described as follows:
619.709 acres, being portions of Section 25, Township 15 South, Range 9 East, and Sections 28, 29, 30, 51, 55, 71, 60, 72, 75, 76, 77 and 79, Township 15 South, Range 10 East, St. Mary Parish, Louisiana, which unit was created by Order No. 450-N of the Department of Conservation of the State of Louisiana dated January 5, 1967, effective January 1, 1967, which is recorded in Conveyance Book 14-P of the records of St. Mary Parish, Louisiana, under Entry No. 132,809, said order being incorporated herein by reference for all purposes and a plat of said unit being attached hereto as Exhibit "A" for all purposes.
It is understood that the acreage set out above is approximate and that the purchase price herein is paid for the mineral interest, mineral rights, and interests is said leases and not upon the specific acreage nor does the purchase price include land which has been heretofore conveyed, only applies to the mineral rights, mineral interest and leasehold interest therein.

II.
Now, for Fifty Thousand and No/100 ($50,000.00) Dollars and other good and valuable consideration heretofore the subject of separate transactions entered into by and between the Sellers and John W. Carlisle, an Officer and Director of the Purchaser, the Sellers agree to convey all mineral rights, interest and leases aforedescribed to the Purchaser in exchange for all the rights, interest and properties of Crown Trucking Co., heretofore conveyed to the said John W. Carlisle, who has in turn conveyed the said rights, interest and properties of Crown Trucking Co. to the purchasing corporation, Alpha Investments Corp. for the sum of Twenty Five Thousand and No/100 ($25,000.00) Dollars for the capital stock of the purchasing corporation, Alpha Investments Corp. Everett Martin Luke, et ux, Norma Lee Junca Luke, are to receive as a part of the consideration for the conveyance of the aforedescribed mineral rights, interest and leases the properties rights and interests of Crown Trucking Co. from Alpha Investments Corp., when that certain promissory note sold to John W. Carlisle by Everett Martin Luke et ux (Entry 144,791 recorded in conveyance book 16 J and Entry 108,887 recorded in Mortgage Book 293) by reference incorporated herein has been paid in full according to its legal face and tenor.

III.
Sellers agree to convey the aforedescribed interests to Purchaser under the terms and conditions of this instrument, subject to the current assignment of royalties and monitary payments for the production from the said interest to the Commercial Bank and Trust Co., a banking institution organized and existing under the laws of the State of Louisiana, and having its principal place of business in Franklin, St. Mary Parish, Louisiana and further subject to easements, if any, for gas and oil pipe lines, electric power lines, telephone and telegraph lines, roads and highways, and subject to taxes and assessments or installments thereof to be paid by the Seller to and through December 31, 1972. Thereafter, the Purchaser is to assume all payments and assessments or installments and taxes on said interest heretofore described.
Sellers agree to furnish upon Purchaser's request an abstract covering title to the aforedescribed interest and Purchaser agrees to submit in writing objections, if any, to said title within ninety (90) days from the receipt of the abstract and title if requested. Sellers shall have a reasonable time thereafter to meet any and all objections, if any, of the objections pertaining to non-disclosure of facts relating to identity of parties, heirship, marriage, and which facts are not ordinarily found in recorded instruments, such objections may be made by affidavit of two or more credible persons who have knowledge of such facts. If any link in the chain of title depends upon the validity of any other deed of trust or conveyances an affidavit or affidavits of credible persons disclosing such facts that such *1102 conditions did exist according to the provisions in any legal instrument shall be conclusive as to such facts as between the Purchaser and the Seller. In the event the Seller is unable to obtain requested curative instruments for any defect more than ten years old, Seller may meet such objections by furnishing in lieu thereof affidavit or affidavits from two or more credible persons disclosing adverse possession, if any, and accordingly Seller and Purchaser will be bound by the affidavit of two or more credible persons making the aforementioned disclosures.
After Purchaser's examination of all abstracts or chains of title appertaining to the aforementioned interest, all such instruments and abstracts shall be returned to the Seller and retained by the Seller until such time as this transaction has been fully consumated.

IV.
Purchaser certifies that it is satisfied as to the value of the aforementioned interest prior to and as a condition precedent to its acceptance and execution of this contract satisfied with the physical condition predicated upon representation by Seller of said premises and agrees that its acceptance hereafter shall be conclusive evidence of the receipt of said premises in the condition satisfactory to Purchaser. Purchaser agrees and submits that no representation as to condition or repair of said premises have been made by Seller or his agents and likewise agrees and admits that no agreement or promises to alter or repair or improve said premise have been made by the Seller or his agents unless such agreement is hereinafter included in this contract as a special provision.

V.
As a part of the consideration for this sale, the Purchaser agrees to pay all expenses in connection with recording of this instrument and any subsequent instruments necessary to consummate this transaction under the laws of the State of Texas and the laws of the State of Louisiana including stamp taxes and all expenses in connection with title to show that the entire sales transaction has been completed and of record.

VI.
It is mutually agreed that any fixtures, portable objects and personal property items now located on the above described premises are no part of the transaction to be consummated by this instrument nor are they bargained for and included in this sales transaction and are hereby specifically excluded therefrom.

VII.
This contract includes the following special provisions which shall control any conflicts in other sections hereof.

VIII.
This agreement constitutes the entire agreement between the Seller and Purchaser, and the Seller is not bound by any agreement, condition, stipulation, understanding or representation made by any of Seller's agents and not contained herein.

IX.
The words "Seller" and "Purchaser and all personal pronouns and relative words used herein with reference to the selling or purchasing party or parties shall apply regardless of number or gender.

X.
It is further understood by the parties hereto that the assignment of monies and royalties to the Commercial Bank and Trust Company of Franklin, Louisiana, herebefore mentioned shall continue until the note with said bank has been fully paid and the obligation has been completely discharged and that the parties hereto are notifying the Commercial Bank and Trust Company and Quintana Petroleum Corporation by registered mail as to this transaction.

*1103 XI.
In testimony whereof the Sellers and the Purchaser have subscribed their respective names on the day and year first above written.
 /s/ Everett Martin Luke
 Everett Martin LukeSeller
 /s/ Norma Lee Junca Luke
 Norma Lee Junca LukeSeller
 Alpha Investments Corp.Purchaser
 /s/ John W. Carlisle
 John W. Carlisle, Executive V. Pres.
THE STATE OF TEXAS
COUNTY OF HARRIS
I, Clyde Austin, a notary public do hereby certify that on this 14th day of December, 1972 A.D., personally appeared before me, John W. Carlisle who being by me first duly sworn, declared that he is the person who signed the foregoing document and that the statements therein contained are true and correct.
My commission expires
June 1, 1973.
 /s/ Clyde Austin
 Clyde Austin, Notary Public
 in and for Harris County, Texas.
THE STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE
I, James Farrier, a notary public do hereby certify that on this ____ day of December 1972 A.D., personally appeared before me, Everett Martin Luke and Norma Lee Junca Luke, who each being by me first duly sworn, severally declared that they are the persons who signed the foregoing document and that the statements therein contained are true and correct.
 /s/ James Farrier
 Notary Public in and for East Baton
 Rouge Parish, Louisiana
 JAMES FARROER
WITNESSES:
/s/ Frances M. Brown FRANCES M. BROWN
/s/ Jemmy Sue Farrier JEMMY SUE FARRIER

APPENDIX 2
All of the right, title and interest of Everett M. Luke in and to the minerals, royalties and other interests included in MA 13- SAND UNIT A, containing 619.709 acres, being portions of Section 25, Township, 15 South, Range 9 East, and Sections 28, 29, 30, 51, 55, 71, 60, 72, 75, 76, 77 and 79, Township 15 South, Range 10 East, St. Mary Parish, Louisiana, which unit was created by Order No. 450-N of the Department of Conservation of the State of Louisiana dated January 5, 1967, effective January 1, 1967, which is recorded in Conveyance Book 14-P of the records of St. Mary Parish, Louisiana, under Entry No. 132,809, said order being incorporated herin by reference for all purposes and a plat of said unit being attached to Contract of Sale.

APPENDIX 3
All of the right, title and interest of Everett M. Luke in and to the oil, gas and other minerals or mineral rights in, to and under the following described property, to-wit:
That certain tract or parcel of land in the Parish of St. Mary, State of Louisiana, situated in Sections 29, 30, 51, 59, 60, 70, 71, 72, 75, 76, 77 and 78, T 15 S, R 10 E, St. Mary Parish, Louisiana, in the vicinity of Bayou Sale, being the highland of Garrett Plantation; beginning at an iron rail on the property line of The Maryland Co., Inc., Point "A", thence South 81 deg. East a distance of 4920.4' to an iron rail on the East side of State Route 60, Point "Q"; thence North 12 deg. 14 min. East, a distance of 179.2' along the East side of State Route 60, to an iron rail, Point "K"; thence South 81 deg. East, a distance of 1413' to an iron rail, Point "L"; thence south 24 deg. 25 min. East a distance of 404' to an iron rail, Point "M"; thence south 8 deg. 51 min. West, a distance of 846.5' to an iron rail, Point "N" on the West right-of-way line of the abandoned Southern Pacific Railroad; thence South 40 deg. 46 min. West, along said West right-of-way line a distance of 576.8' to Point "N", the P.C. of a 4 deg. curve; thence further along said right-of-way and in a Southerly *1104 direction around said curve, a distance of 1072.2' to Point "N" the P.T. of said 4 deg. curve; thence South 1 deg. 3 min. East further along said right-of-way, a distance of 842.6' to an iron rail, Point "O"; thence North 80 deg. 36 min. West along the North property line of Johnson Plantation, a distance of 5576' to an iron pipe, Point "D"; thence North 9 deg. 36 min. East, a distance of 1282.3' to an iron rail, Point "E"; thence North 78 deg. 56 min. West a distance of 864.7' to an iron rail, Point "F"; thence North 15 deg. 17 min. East a distance of 715.4' to Point "G"; thence North 74 deg. 43 min. West a distance of 105' to an iron pipe, Point "H"; thence North 15 deg. 17 min. East, a distance of 102.2' to an iron pipe; Point "I"; thence South 74 deg. 43 min. East a distance of 105' to Point "J"; thence North 15 deg. 17 min. east a distance of 1194.8' to an iron rail, Point "A"; the point of beginning. Bounded on the North by property of The Maryland Co., Inc., on the East by property of Laws, Huth & Aycock, on the South by Johnson Plantation, property of Alice C. Plantation and Refinery, Inc., and on the West by land of Laws, Huth & Aycock. All as is more fully shown on map made by T.F. Kramer, C.E., dated January 12, 1950, annexed to act of sale recorded in Book 7-M of the Conveyance Records, Entry No. 80,285, St. Mary Parish, Louisiana, together with all buildings and improvements thereon situated, rights, ways and appurtenances thereto belonging or in anywise appertaining.
Being the same property on which oil, gas and/or minerals or mineral rights were reserved by said Everett M. Luke, Jr. in that certain act of sale to The Garrett Plantation, Inc. dated September 28, 1967, recorded October 4, 1967, in St. Mary Parish Conveyance Book 14-Z, page 96, Entry No. 134,664.
NOTES
[1] This contract is attached to this opinion as "Appendix 1". The record does not show whether the Luke mineral interest is community or separate property.
[2] The depositions filed in the record indicated that Reisfeld also purchased a judgment against Everett Luke that existed prior to the Luke-Alpha transaction.
[3] No copy of this transaction is in the record, but the parties do not contest this fact.
[4] Apparently, Mrs. Luke remarried.
[5] The record indicates that Reisfeld, at some point in time, purchased a preexisting judgment against Everett Luke; however, Reisfeld did not seize and sell the Luke mineral interest pursuant to that judgment.
[6] Reisfeld apparently assumed that the Luke-Alpha contract was an agreement to sell.
[7] Alpha was made a party garnishee and was given notice of seizure through a court-appointed attorney.
[8] We do not opine as to what is the applicable prescriptive period, if any, for the absolute nullity of sale of the property of another since such prescription is not presently at issue in these proceedings.
[9] See "Appendix 2".
[10] See "Appendix 3".